833 F.2d 1013
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Helen SHARP, Administrator of Estate of Bryon D. Redmon,
deceased, Plaintiff- Appellant,
v.
Garland NIBERT, Police Chief, Christian P. Morris, City
Manager, City of Gallipolis, James Montgomery, Sheriff,
Gallia County, Silas Hamilton, Sheriff's Captain, Oliver
Raygo, Jailor, Anthony Haner, Dispatcher, John Does,
Defendants-Appellees.
 No. 86-4138.
 United States Court of Appeals, Sixth Circuit.
 Nov. 24, 1987.
 
 Before ENGEL and CORNELIA G. KENNEDY, Circuit Judges, and JOHN W. POTTER*, District Judge.
 PER CURIAM.
 
 
 1
 Plaintiff-appellant Helen Sharp ("plaintiff") appeals the judgment of the District Court granting the motions of defendants-appellees Oliver Raygo, Anthony Haner, Silas Hamilton, and James Montgomery (collectively "defendants") for summary judgment in this civil rights and wrongful death suit. Raygo was a jailor for Gallia County, Ohio. Haner is a dispatcher for the Gallia County Sheriff's Department, Hamilton is a Gallia County Sheriff's Captain, and Montgomery is the Gallia County Sheriff. The plaintiff is the administratrix of the estate of her son, Bryon D. Redmon, who was shot and killed at the culmination of a confrontation between himself and defendants Raygo, Haner, and Hamilton. The issue on appeal is whether the defendants' conduct supports an action under 42 U.S.C. Sec. 1983. For the reasons that follow, we affirm.
 
 
 2
 The facts of the dispute are not seriously at issue, as all the witnesses' accounts substantially interlock. Ohio State Trooper Mark Atkeson stopped Redmon on suspicion of drunk driving. Since Redmon had been arrested for drunk driving the previous night and had failed to show up at a hearing that morning, Atkeson decided to put him in custody. After completing tests and forms at the Highway Patrol station, Atkeson took Redmon to the jail at the Gallia County Sheriff's Office. Atkeson told the jailor, defendant Raygo, that Redmon had not given him any trouble and so although he was alone in the jail, Raygo told Atkeson that he didn't need him to remain. Joint Appendix at 59, 124.
 
 
 3
 The next sequence of events involved only Redmon and Raygo, and were witnessed in part by Michael Rife, a prisoner, who was in a cell. Raygo proceeded to search Redmon, who stood with his feet spread and his hands against a wall. Raygo testified that as he was patting down Redmon's legs, Redmon swore at him, swung around with a sort of razor in his hand, and sliced Raygo's neck.[1] Joint Appendix at 124-38. The two began to wrestle, with Redmon obtaining the upper hand. Joint Appendix at 134-35. Rife confirms Raygo's testimony that Redmon ended up on top of Raygo, testifying that Redmon choked him until he turned blue. Joint Appendix at 134-35, 196-97. At this point Raygo, attempting to soothe Redmon, told him he would get him something to calm him down if he would let Raygo up. Joint Appendix at 135-36.
 
 
 4
 Redmon released Raygo, who went to a gun cabinet in the office, unlocked it, and took out a .357 magnum. Joint Appendix at 136-37. Raygo then escorted Redmon out of the jail to the Sheriff's department. As they reached the department, Haner, the radio dispatcher, came out of his office to see who was coming in. Haner testified that he knew something was wrong when he saw Raygo had a gun. In response to Raygo's request to get help, Haner called for Captain Hamilton over the radio. Haner and Raygo both testified that when Haner returned to the Sheriff's office, Haner told Redmon to sit down, whereupon Redmon pushed Haner back and started to struggle with him. When Raygo attempted to help Haner, Haner broke free. While struggling with Raygo, Redmon managed to get his gun. Redmon shot Raygo in the ankle and then shot Haner in the calf of his leg. Haner tried to call for help again, but Redmon followed him into the dispatcher's office and ripped wires out of the radio. He demanded a set of keys to a patrol car, and when Haner hesitated, Redmon struck him over the head with the butt of the gun, grabbed him, and put the gun to his forehead. Haner, seeing Captain Hamilton in the doorway, pulled on Redmon's arm to move the gun from his head. The gun went off again, shooting Haner in the knee.
 
 
 5
 Hamilton drew his gun and told Redmon to drop his weapon. Redmon kicked him in the shoulder and the two men began to struggle. Redmon ended up on his hands and knees with Hamilton on top of him. Redmon twisted back and forth, trying to shoot at Hamilton, and he was finally able to hit Hamilton on the back of the head. Hamilton redrew his own gun and struck the back of Redmon's head. Redmon, temporarily subdued, rested on the floor, while Hamilton, his head bleeding, got up and leaned dazedly against a file cabinet.
 
 
 6
 At about this time, two Gallipolis police officers, Owens and Thomas, arrived at the Sheriff's office, having heard on the radio that shots had been fired. Elliot, realizing that Haner had been shot, obtained a shotgun and warned Redmon. Redmon, who had Hamilton's slapstick in his possession, asked him what kind of shotgun it was, and then grabbed it, saying "Shoot me, shoot me, go ahead." They struggled briefly, and then Redmon let go of the shotgun and kicked Elliot in the shoulder. Redmon then went after Owens with the slapstick, and Owens shot and killed him.
 
 
 7
 Helen Sharp, the administratrix of the estate of her son, Bryon Redmon, brought this suit against Owens, Elliot, Hamilton, Raygo, Haner, Sheriff Montgomery, and assorted other local officials pursuant to 42 U.S.C. Sec. 1983 and the eighth and fourteenth amendments. She further alleged a pendent state claim under Ohio's wrongful death statute. The U.S. District Court for the Southern District of Ohio granted the defendants' motion for summary judgment with respect to everyone except Owens, the officer who had actually shot Redmon.[2] Joint Appendix at 46. A jury returned a verdict in favor of Owens. Plaintiff's appeal concerns only the granting of summary judgment for Hamilton, Raygo, Haner, and Montgomery.[3]
 
 
 8
 A court should grant summary judgment only when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The nonmoving party is entitled to have all facts and reasonable inferences construed in its favor. Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970). However, "[w]here the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir.1987) (citing Celotex Corp. v. Catrett, 106 S.Ct. 2548 (1986)).
 
 
 9
 The plaintiff brought this suit under 42 U.S.C. Sec. 1983, which provides a cause of action against anyone who, under color of state law, "causes ... the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." The plaintiff appeared to allege in her complaint that the defendants deprived her son of his eighth and fourteenth amendment rights. Joint Appendix at 7.
 
 
 10
 The plaintiff has not seriously pursued her eighth amendment claim; at any rate the eighth amendment is not pertinent to this case:
 
 
 11
 Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions.... [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law. Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment.
 
 
 12
 Ingraham v. Wright, 430 U.S. 651, 671-72 n. 40 (1977) (emphasis added).
 
 
 13
 The plaintiff also challenges the defendants' conduct under the fourteenth amendment, which provides in pertinent part that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, Sec. 1. In order to sustain a claim pursuant to section 1983 and the fourteenth amendment, the plaintiff must show that 1) the conduct at issue was performed under color of state law; 2) the conduct caused a deprivation of fourteenth amendment rights; and 3) the deprivation occurred without due process of law. Nishiyama v. Dickson County, Tenn., 814 F.2d 277 (6th Cir.1987) (en banc).[4] While the Constitution did not guarantee Redmon life, the fourteenth amendment protected him "from being deprived of his life by the state without due process of law." Jones v. Sherrill, No. 85-5828, slip op. at 5 (6th Cir. Sept. 2, 1987). This case concerns the second element, whether there has been a deprivation within the meaning of the fourteenth amendment.
 
 
 14
 The theory of the plaintiff's case is that if defendant Montgomery had properly supervised the other defendants, and if the other defendants had properly cared for Redmon while he was in their custody, the situation would not have escalated into the circumstances that resulted in Redmon's death. She argues that the defendants' actions deprived her son of his life without due process of law.
 
 
 15
 The plaintiff must show that the defendants' actions were more than merely negligent. The Supreme Court, in Daniels v. Williams, 106 S.Ct. 662 (1986), held that mere lack of due care by a state official does not "deprive" an individual of life, liberty or property under the fourteenth amendment. Id. at 664-65. "Far from an abuse of power, lack of due care suggests no more than a failure to measure up to the conduct of a reasonable person. To hold that injury caused by such conduct is a deprivation within the meaning of the Fourteenth Amendment would trivialize the centuries-old principle of due process of law." Id. at 665. Although the Court left open the question of whether something more than mere negligence, for example, gross negligence, could amount to a deprivation, id. at 667 n. 3, the Sixth Circuit has decided that allegations of gross negligence do state a claim under section 1983. Nishiyama, 814 F.2d at 282. In Nishiyama the defendant sheriff and his deputy allowed a convicted felon in their custody unsupervised use of a patrol car, even though they knew he was dangerous and that he had previously assaulted a young woman. Allegedly, the felon was cruising alone in the patrol car when he stopped the plaintiffs' daughter and brutally murdered her. The plaintiffs sued under section 1983, alleging that the defendants' conduct deprived their daughter of her fourteenth amendment rights. This Court held that grossly negligent conduct may result in a deprivation within the meaning of the fourteenth amendment, and as such will support a section 1983 claim. Id. at 282. The Court added that:
 
 
 16
 We acknowledge that the term "gross negligence" evades easy definition. In our view, a person may be said to act in such a way as to trigger a section 1983 claim if he intentionally does something unreasonable with disregard to a known risk or a risk so obvious that he must be assumed to have been aware of it, and of a magnitude such that it is highly probable that harm will follow.
 
 
 17
 Id. In finding that the plaintiffs' allegations stated a claim, the court noted that the defendants had intentionally given the felon full unsupervised use of an officially marked and equipped patrol car, and that after they were notified that one of their patrol cars was stopping motorists in the county they failed to try to recall the felon to jail, or even to investigate. Id.
 
 
 18
 In light of this case law, the issue in this case is whether a question of fact exists as to whether the defendants' conduct deprived Redmon of life without due process of law under the Nishiyama test. We will discuss each defendant separately.
 
 Raygo
 
 19
 The plaintiff argues that Raygo, the jailer, should have realized that Redmon was upset when Redmon swore at him and cut him with a razor. She contends that Raygo should have tried to avoid further confrontation by calling or signaling the dispatcher, Haner, for help. Raygo, according to the plaintiff, should have allowed Redmon to make a phone call, and should not have tried to lead him toward a cell. The plaintiff claims that after the wrestling encounter a reasonably trained deputy would have made an emergency call for help. Instead, Raygo got a gun, that he was not authorized to carry, and took Redmon, unhandcuffed, to the dispatcher's office. The plaintiff argues that such conduct warrants an inference of "intentional carelessness, deliberate indifference, gross recklessness, incompetence, a reckless disregard for the safety of emotionally unstable detainees, and a gross lack of effective training." Plaintiff's brief at 22.
 
 
 20
 In spite of the plaintiff's labeling, we hold that these allegations do not meet the definition of gross negligence put forth in Nishiyama. "Nishiyama did not hold that a mere allegation of gross negligence or aggravated negligence would always be enough to withstand a motion to dismiss. Negligence does not become 'gross' just by saying so." Jones, slip op. at 8. Raygo had no previous warning that Redmon was dangerous and needed to be controlled. Redmon, who had been arrested for drunk driving, a non-violent offense, had been docile until the moment he turned on Raygo. He behaved well while in front of Raygo and Atkeson, Joint Appendix at 124, and Atkeson told Raygo that Redmon had not given him any problems, Joint Appendix at 59. Raygo could not have known that Redmon had a weapon; he was frisking him when Redmon pulled it out. Raygo's action of obtaining the gun may have been negligent, but it was not of the magnitude of gross negligence. Thus, we hold that the District Court properly granted Raygo summary judgment.
 
 Haner
 
 21
 The plaintiff alleges that Haner, the dispatcher, was inexperienced and untrained, and this, along with Raygo's "incompetence", contributed to Redmon's action of grabbing Raygo's gun and the following events. Haner may have been inexperienced, but there is no evidence in the record that he was not qualified to be a dispatcher. Apparently, the only action of Haner that the plaintiff criticizes is his order to Redmon to sit down. It is somewhat difficult to conceive of how the issuing of such a command was grossly negligent, or how it contributed to Redmon's death. Consequently we hold that the District Court properly granted him summary judgment.
 
 Hamilton
 
 22
 It is unclear which actions of Captain Hamilton the plaintiff feels were grossly negligent. She states that she is not contending that Hamilton was unjustified in subduing Redmon by hitting him over the head with his gun. Plaintiff's brief at 24-25. Rather, the facts she argues support her claim are that Hamilton was the officer in charge during the night of these events, that he had only two deputies, Raygo and Haner, under his supervision and control, that he possessed very little information about Raygo, and that he had practically no knowledge about what was going on over at the jail.
 
 
 23
 Even assuming all these allegations to be true, they do not indicate the sort of gross negligence necessary to amount to a deprivation under the fourteenth amendment. The plaintiff does not allege, nor do any facts show, that Hamilton violated any stated procedure or policy, or that something had happened in the past such that he should have known that Raygo or Haner would not be able to handle this sort of situation. In short, the plaintiff has not alleged that Hamilton "intentionally [did] something unreasonable with disregard to a known risk or a risk so obvious that he must be assumed to have been aware of it." Nishiyama, 814 F.2d at 282. Consequently we hold that the District Court properly granted Hamilton summary judgment.
 
 James Montgomery
 
 24
 The plaintiffs argue that Sheriff Montgomery failed to properly train and supervise Raygo and Haner. Montgomery, however, testified that Raygo, Haner and Hamilton were qualified, capable, and sufficiently trained and supervised. Joint Appendix at 336. No contrary evidence exists in the record before this Court. The plaintiff further argues that Montgomery was negligent with respect to Raygo's possession of a gun at the jail. However, although it is clear that Montgomery knew that Raygo was not certified to carry a gun, Joint Appendix at 184, the evidence also shows that he did not know Raygo kept one in the jail. Joint Appendix at 336. The plaintiffs have not shown any evidence to the contrary. Finally, the plaintiff argues that since a sheriff is vicariously liable for the misconduct of his deputies under Ohio law, Ohio Rev.Code Ann. Sec. 311.05, he is similarly liable under section 1983, citing Johnson v. Duffy, 588 F.2d 740 (9th Cir.1978). However, respondeat superior is not recognized under section 1983 in this Circuit. Hays v. Jefferson County, Ky., 668 F.2d 869, 872 (6th Cir.), cert. denied, 459 U.S. 833 (1982). See also Monell v. Department of Social Servs., 436 U.S. 658, 690-95 (1978) (respondeat superior liability may not be imposed under section 1983 upon a municipality). To impose liability a direct causal link must exist between the actions of the individual officers and the supervisory defendant. Hays, 668 F.2d at 872. As noted above, no evidence in the record indicates that such a link exists between Montgomery and the other three defendants. Consequently, we hold that the District Court properly granted Montgomery summary judgment.
 
 
 25
 Accordingly, we AFFIRM the judgment of the District Court.
 
 
 
 *
 The Honorable John W. Potter, United States District Court for the Northern District of Ohio, sitting by designation
 
 
 [1]
 The plaintiff asserts that questions of fact exist as to whether such a razor existed and whether Redmon cut Raygo with it. However, the evidence is considerable that such a weapon existed. See, e.g., Joint Appendix at 65, 77, 133, 244. Furthermore, as the plaintiff appears to admit, the question is not material because even if we assume that no razor existed, uncontroverted evidence shows that Redmon initiated the aggressions by wrestling Raygo to the ground and trying to choke him
 
 
 [2]
 Since federal claims no longer existed against these defendants, the District Court properly dismissed the pendent state claims against them. Joint Appendix at 45
 
 
 [3]
 Although the plaintiff's notice of appeal indicated that she was also appealing the summary judgments for defendants Paul Niday, James Saunders, Lonnie Burger and Gallia County, and the jury verdict in favor of defendant Jack Owens, she has abandoned those claims
 
 
 [4]
 The plaintiff argues that when an arrestee or detainee is killed by an officer while under custody, the decedent is entitled to a rebuttable presumption that his constitutional rights were violated. We could find no support for such a presumption